**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PINDAK, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 12-c-4005** |
| | ) | **Judge Matthew F. Kennelly** |
| **CITY OF CHICAGO, et al.** | ) | **Magistrate Judge Nan R. Nolan** |
| | ) | |
| **Defendants.** | ) | |

**DEFENDANTS' MOTION TO ENFORCE SETTLEMENT**

Defendants City of Chicago, Theresa Nazario, John Bakopoulus, Lucas Wise and Unknown Police Officers (collectively, the "City"), by their attorney, Stephen R. Patton, Corporation Counsel for the City of Chicago, respectfully move this Court to enforce the oral settlement they entered into with Plaintiffs Kim Pindak, John Hall, McArthur Hubbard, Lorenzo King, Ronald Portis, Roger Young, William Johnson, and Bonita Franks (collectively, "Plaintiffs"). In support of its motion, the City states as follows:

**Background**

1. In their Complaint, which was filed on May 23, 2012, Plaintiffs, on behalf of themselves and a putative class, claim that Defendants violated their First Amendment rights by telling them that it was illegal to panhandle on North Michigan Avenue and threatening to arrest them if they did not relocate elsewhere. *See* Compl. ¶ 2. In Count I, Plaintiffs seek declaratory and injunctive relief on behalf of the putative class. *Id.* p. 13. Plaintiffs request in Counts II and III monetary damages against the defendant police officers and the City, respectively, on behalf of themselves only. *Id.* pp. 14-15. In Count IV, Plaintiffs seek compensatory damages on behalf of themselves against unknown police commanders on a theory of supervisory liability. *Id.* p. 16.

2. On June 1, 2012, Plaintiffs filed a motion for a preliminary injunction. They asked the court to enter an order preliminarily enjoining the City from continuing to interfere with their First Amendment rights to panhandle on North Michigan Avenue.

3. Prior to the status hearing on June 14, 2012, Plaintiffs sent the City a list of their demands for settlement. *See* E-mail dated June 13, 2012, attached hereto as Exhibit 1.

4. At the status hearing on June 14, 2012 the parties indicated their desire to discuss settlement before Magistrate Judge Nolan, and this Court referred the matter to her for settlement discussions. *See* Order dated June 14, 2012, attached hereto as Exhibit 2.

**A. The June 22, 2012 Settlement Conference**

5. The parties scheduled a settlement conference before Magistrate Judge Nolan for June 22, 2012. Prior to the scheduled conference, the City sent Plaintiffs and Magistrate Judge Nolan a proposal under which the City would agree to settle the case. *See* Letter dated June 21, 2012, attached hereto as Exhibit 3.

6. At the June 22, 2012 settlement conference before Magistrate Judge Nolan, the parties negotiated a settlement that would resolve the entire case through a compromise of the terms contained in both Plaintiffs' demand (Ex. 1) and the City's counterproposal (Ex. 2). The material terms of the agreement were: In consideration of Plaintiffs' dismissing their claims against the City with prejudice, the City agreed to:

a. acknowledge and reaffirm that panhandling on Michigan Avenue, so long as it does not contravene the City's Aggressive Panhandling Ordinance or some other law, is legally permitted;

b. issue individual notification ("Panhandling Notification") to all police officers of the 18th Police District (which covers North Michigan Avenue) that panhandling on North Michigan Avenue is legally permitted unless it violates the Aggressive Panhandling Ordinance or some other law, with a control/signature sheet to ensure receipt by all officers in the 18th Police District (a copy of the proposed Panhandling Notification was provided to Plaintiffs at the settlement conference);

c. pay $750 to each of the six named Plaintiffs;

d. provide Plaintiffs with all of their arrest histories and contact cards as maintained by the City; and

e. pay $40,000 in attorneys' fees.

7. On June 26, 2012, this Court entered an order, based on Magistrate Judge Nolan's report that the parties had reached settlement, vacating the dates for the City to respond to the Complaint and the motion for a preliminary injunction. *See* Order dated June 26, 2012, attached hereto as Exhibit 4. The Court set a status hearing for July 11, 2012 and stated that it would vacate the preliminary injunction date if the parties had concluded or made significant progress towards a settlement. *See id.*

8. On July 2, 2012, Magistrate Judge Nolan entered an order stating, in part: "Settlement conference held on 6/22/2012. *Agreement reached*. Parties directed to file stipulated dismissal order within thirty (30) days with the District Judge." *See* Order dated July 2, 2012 (emphasis added), attached hereto as Exhibit 5.

9. On July 11, 2012, the Court held a status conference at which the parties reported that the matter had been resolved and that the parties were in the process of reducing their settlement to

writing. The Court continued the matter for further status on August 16, 2012.

**B. Implementation of the Settlement**

10. Following the June 22, 2012 Settlement Conference, the parties began to work out the details of the settlement and started to implement some of its terms.

11. For example, on June 22, 2012, Plaintiffs' counsel sent the City a list of names and dates of births for the individual plaintiffs for whom the City had agreed to locate contact cards.[1] *See* E-mail dated June 22, 2012, attached hereto as Exhibit. 6. In the same e-mail, Plaintiffs' counsel stated that Plaintiffs' costs for filing the lawsuit had not been discussed at the Settlement Conference and asked whether the City would agree to pay the costs. By return email, the City's counsel said he would recommend payment of the costs. *See* E-mail dated June 25, 2012, attached hereto as Exhibit 7. The payment of Plaintiffs' costs was in fact inserted into the draft settlement agreement. *See infra*, ¶ 14.

12. On June 25, 2012, the City's counsel advised Plaintiffs that he had made the request to the Chicago Police Department ("CPD") for the contact card information they were seeking and, in addition, attached a revised Panhandling Notification for Plaintiffs' review, which Plaintiffs then approved. *See* E-mails between June 25, 2012 through June 28, 2012, attached hereto as Exhibit 8.

13. On July 2, 2012, the City's counsel advised Plaintiffs that he was drafting a settlement agreement that he would forward to Plaintiffs for review. *See* E-mail dated July 2, 2012, attached hereto as Exhibit 9. In the same email, the City's counsel advised Plaintiffs that he had forwarded the Panhandling Notification to CPD so they could start the process of issuing it to each officer in

---

[1] Contact cards document encounters between Chicago Police officers and individuals whom police meet on their beats and list information ranging from someone engaged in suspicious activity to someone who may be a possible witness.

the 18th District. *See id.* In addition, the City's counsel asked Plaintiffs how they wanted to receive payment of the attorneys' fees and payments to the individual Plaintiffs so that the City could begin processing the payments. *See id.* On the same day, Plaintiffs responded that they agreed with the City counsel's suggestion of receiving one check that would include both attorneys' fees and Plaintiffs' individual payments. *See id.*

14. On July 3, 2012, the City's counsel forwarded a copy of the draft settlement agreement to Plaintiffs. *See* E-mail dated July 3, 2012, attached hereto as Exhibit 10; Draft Settlement Agreement, attached hereto as Exhibit 11. The terms of the draft settlement agreement mirror the terms agreed upon at the June 22, 2012 Settlement Conference except that it includes payment by the City of Plaintiffs' costs of $350, as discussed above in Paragraph 11. The City's counsel also notified Plaintiffs that he had received copies of the contact cards for the individuals they requested and asked them if they wanted to come by and pick them up. *See* Ex. 10.

15. On July 13, 2012, Plaintiffs responded to the draft settlement agreement by raising two issues. *See* E-mail dated July 13, 2012, attached hereto as Exhibit 12. The first issue concerned the language of the release in the settlement agreement. This issue was subsequently resolved in a telephone conversation in which the parties agreed to insert the words "arising out of" in the paragraph treating the release of claims. The second issue concerned Plaintiffs' counsels' assertion that the City had agreed to insert in the settlement agreement the billing rate of one of Plaintiffs' counsel, Mark Weinberg, as being $400/hr. *Id.* The City responded that it had only agreed to pay $40,000 in attorneys' fees to the two Plaintiffs' attorneys, Mark Weinberg and Adele Nicholas, and had not agreed to any specific billing rate or to inserting any specific billing rate in the settlement agreement. *See* E-mail dated July 16, 2012, which is included in Exhibit 12. The parties did not

discuss this issue any further.

16. In reliance on the parties' settlement, the CPD has been issuing the agreed-upon Panhandling Notification to its officers in the 18th Police District. A copy of notice and the acknowledgment of receipt list are attached hereto as Exhibit 13.

**C. Plaintiffs Seek To Re-Negotiate The Settlement**

17. On July 24, 2012, not hearing anything further from Plaintiffs for several days, the City's counsel e-mailed Plaintiffs and inquired about what else was needed to finalize the written settlement agreement. *See* E-mail dated July 24, 2012, attached hereto as Exhibit 14.

18. On July 26, 2012, Plaintiffs responded by stating that "there are a few additional issues that we need to address *before we can reach a settlement*." *See* E-mail dated July 26, 2012 (emphasis added), attached hereto as Exhibit 15. Plaintiffs' counsel stated that they now wanted the City to produce *all* contact cards issued to *anyone* on Michigan Avenue for the past two years so that they could identify "additional class members who are entitled to relief prior to dismissing this case" and that they are unwilling to settle the case unless the settlement includes relief for such unnamed class members. *Id.* In addition, Plaintiffs threatened to bring additional claims for Fourth Amendment and equal protection violations. *Id.*

19. On July 31, 2012, the parties conferred by telephone regarding Plaintiffs' new position on settlement. In that conference call, the City explained to Plaintiffs that they had an ethical and legal duty to abide by the terms of the settlement agreement reached before Magistrate Judge Nolan; that the City had already been implementing the terms of the agreement; and that Plaintiffs were aware that the City had been implementing the terms of the agreement and had voiced no disagreement until Plaintiffs' July 26, 2012 e-mail. Plaintiffs declared that, unless the City was

prepared to re-open the settlement agreement, Plaintiffs were going to move forward with their lawsuit and new claims and their motion for a preliminary injunction.

20. Plaintiffs' conduct here is unconscionable. Plaintiffs seek to scuttle the terms agreed upon during the June 22, 2012 Settlement Conference and renegotiate the settlement on completely different terms regarding completely different claims than were raised in the lawsuit.[2]

21. The City, in good faith reliance that a settlement existed between the parties, began implementing the material terms of the agreement, namely, (a) producing contact card information for the named Plaintiffs;[3] (b) disseminating the Panhandling Notification to the individual officers of the 18th Police District; (c) initiating procedures to have a check issued to Plaintiffs' counsel for payment of attorneys' fees and payments to individual Plaintiffs; and (d) forwarding a draft settlement agreement to Plaintiffs. The only issue which arose prior to Plaintiffs' July 26, 2012 email that was not resolved was Plaintiffs' claim that the City agreed to insert Mark Weinberg's billing rate of $400/hr into the written settlement agreement. This issue, however, is not a material term of the settlement agreement because it has no bearing on the City's agreed obligation to pay $40,000 in attorneys' fees.

---

[2] Plaintiffs' lawsuit never requested compensatory damages for the putative class members (only injunctive relief). In fact, Plaintiffs never requested compensatory damages for putative class members in Plaintiffs' settlement demand prior to the June 22, 2012 Settlement Conference. *See* Ex. 1.

[3] Plaintiffs will no doubt complain that the City has not produced all the contact card information which Plaintiffs believe exists. Principally, this complaint relates to one Plaintiff, John Hall, for whom no contact cards were found despite several requests. Because there were errors in the correct spelling and dates of birth of the Plaintiffs (which was caused by both City counsel and Plaintiffs' counsel,) the City had to make three separate requests to CPD to identify the information. Eventually, the contact cards for all the Plaintiffs were found, except for John Hall, for whom no contact cards were identified. The City was willing to make yet another request regarding John Hall using different identifying information before Plaintiffs decided to repudiate the settlement agreement.

**Argument**

22. Federal courts routinely enforce oral settlement agreements. *See Dillard v. Starcon Int'l, Inc.*, 483 F.3d 502, 507-08 (7th Cir. 2007) (oral settlement agreement enforced in employer discrimination case in which there was a clear offer, acceptance, and meeting of the minds and where disputed additional terms were not material); *Elustra v. Mineo*, 595 F.3d 699, 709 (7th Cir. 2010) (oral settlement agreement enforced when material terms, such as specified total amount of damages, were definite and certain, even though the damages were not yet allocated amongst the plaintiffs). *See also Nance v. Rothwell*, 09 C 7733, 2012 WL 1230722 (N.D. Ill. Jan. 17, 2012) (enforcement of oral settlement agreement and denial of one party's attempt to add new terms).

23. State law governs the enforcement of oral settlement agreements, and "oral settlements are enforceable under Illinois law." *Dillard*, 483 F.3d at 506 (*citing Lynch, Inc. v. SamataMason Inc.,* 279 F.3d 487, 490 (7th Cir. 2002); *Kokkonen v. Guardian Life Ins. Co.,* 511 U.S. 375, 380-82 (1994)). "Under Illinois law, a settlement is valid if there is an offer, acceptance, and a meeting of the minds" as to the material terms of the agreement. *Elustra*, 595 F.3d at 708. A meeting of the minds "depends on the parties' objective conduct, not their subjective beliefs," and the material terms of the agreement must be "definite and certain." *Dillard*, 483 F.3d at 507. Moreover, where subsequent disputed terms "do not implicate the heart of [the] settlement," *id.* at 508, they are likely not material and "the fact that the parties leave some details for counsel to work out during later negotiations cannot be used to abrogate an otherwise valid agreement." *Zendejas v. Reel Cleaning Servs., Inc.*, 05 C 6933, 2009 WL 2431299, at *9 (N.D. Ill. Aug. 6, 2009) (*quoting Porter v. Chi. Bd. of Educ.,* 981 F. Supp. 1129, 1131 n.4 (N.D. Ill.1997)).

24. One party's change of heart or attempt to include new, previously unmentioned terms

after an oral settlement agreement has been reached does not render the agreement unenforceable. *See Elustra*, 595 F.3d at 709 ("Post-acceptance conduct does not retract an earlier acceptance. The simplest explanation of their behavior is buyers' remorse . . . ."); *Glass v. Rock Island Ref. Corp.*, 788 F.2d 450, 454 (7th Cir. 1986) ("A party to a settlement cannot avoid the agreement merely because he subsequently believes the settlement insufficient."). *See also Nance*, 2012 WL 1230722 ("The fact that [a party], in hindsight, may think he should have struck a better bargain, is irrelevant.").

25. In this instance, there can be no question that the parties reached a settlement. As discussed more fully above, *see supra*, ¶¶ 5-9, at the settlement conference before Magistrate Judge Nolan on June 22, 2012, the City proposed terms pursuant to which it would be willing to settle, the parties (with Magistrate Judge Nolan's assistance) negotiated, and the parties agreed to the material terms of the settlement. That a settlement was reached is confirmed by Magistrate Judge Nolan's July 2 order which states: "Settlement conference held on 6/22/2012. Agreement reached. Parties directed to file stipulated dismissal order within thirty (30) days with the District Judge." *See* Exhibit 5.

26. Moreover, on July 11, 2012, both sides reported to this Court at the status conference that the case had been settled.

27. Indeed, the parties' conduct after the settlement conference further confirms that a settlement was reached. *See supra*, ¶¶ 10-16.

28. Plaintiffs' statements in their July 26 e-mail that there are "additional issues that we need to address before we can reach a settlement" and that they are "still interested in discussing a global settlement of the case," *see* Exhibit 15, are duplicitous. They seek to cover over the fact that

the parties settled the case on June 22 and that Plaintiffs have been operating and conducting themselves pursuant to that settlement ever since. Indeed, Plaintiff's July 26 e-mail demonstrates that the reason they want to undo the settlement is because they now believe – *based on information provided to them by the City in good faith reliance on the settlement* – that they can obtain relief for unidentified individuals. Plaintiffs' apparent case of "buyer's remorse" does not alter the fact that the parties agreed to the material terms of the settlement or that the parties have been implementing that settlement since it was reached before Magistrate Judge Nolan.

29. And any suggestion by Plaintiffs that the settlement somehow compromises the rights of those unidentified class members is preposterous. No class has been certified, and the settlement does not bind anyone but the named Plaintiffs.

30. Plaintiffs' new position is a shameless double-cross of everything they have been saying to the City, Magistrate Judge Nolan, and this Court since the June 22, 2012 Settlement Conference. Plaintiffs should be ordered to accept the settlement they agreed to on June 22.

**Conclusion**

**WHEREFORE**, the City respectfully requests that this Court enter an order: (i) enforcing the terms of the settlement as set forth herein and in the draft settlement agreement attached hereto as Exhibit 11; (ii) awarding the City its attorneys' fees and costs in seeking to enforce the settlement; and (iii) granting the City such further relief, including sanctions, as the Court deems just and appropriate.

Date: August 3, 2012

Respectfully submitted,

STEPHEN R. PATTON,
Corporation Counsel for the City of Chicago

By: /s/ William Macy Aguiar
Assistant Corporation Counsel

Michael J. Dolesh
William Macy Aguiar
City of Chicago, Department of Law
Constitutional and Commercial Litigation Division
30 North LaSalle Street, Suite 1230
Chicago, Illinois 60602
(312) 744-9028 / 4216

Attorneys for Defendants